In our next argued case, we have one person in person, I believe, and one that will be Oh, I'm sorry. I was waiting for them, and they're waiting for me. The next argued case is Kong v. Trader Joe's Company, Number 20-56415. I apologize for the delay. Okay, you're muted. So there we go. We can now hear you, and we appreciate it. So with that, you may begin. Thank you, Your Honor. May it please the Court, I'd like to reserve three minutes for rebuttal. Keep track of your time, and please introduce yourself for the record. Of course, Your Honor. My name is Mark John Doe, and I represent the plaintiffs and appellants in this case. This appeal concerns a dismissal of a punitive class action against Trader Joe's Company related to the 401k plan sponsored by Trader Joe's. Plaintiffs have alleged that defendants reached a fiduciary duties under arrest to the plan participants. The District Court's decision dismissing plaintiffs' amended complaint must be reversed for two overarching reasons. The first is the decision is inconsistent with the Supreme Court's decisions in Hughes v. Northwestern, which was decided just a couple of months ago, and the Supreme Court's prior case of Tybill v. Edison International, which was decided in 2015. Additionally, the decision is inconsistent with Ninth Circuit precedent, particularly this Court's decision in Tybill v. Edison in 2016. By way of background, the Hughes v. Northwestern decision issued by the Supreme Court was very much like this case. Like the plaintiffs in Hughes v. Northwestern, the plaintiffs here allege that defendants failed to select cheaper versions of the same investment fund. This was also the same issue in Tybill v. Edison. The Hughes decision also states that each investment must be evaluated on its own merits. Thirdly, in Hughes, the Supreme Court stated courts must evaluate allegations that fiduciaries failed to monitor a plaintiff's investments in light of the principles set forth in Tybill v. Edison to determine whether plaintiffs have stated a plausible claim for relief. Tybill states that courts must apply trust law principles in determining whether a fiduciary has breached their fiduciary duties, which leads me to this case. This case presents a classic example of fiduciaries breaching their fiduciary duties by failing to follow trust law principles. The complaint here identifies at least two trust law principles which the plaintiffs allege defendants violated. The first is a trustee must continually monitor investments selected by the trust to make sure they continue to be appropriate for the trust. The issue here is that the plaintiff's fiduciary selected a slate of investments, including what we consider what we call mutual fund A-shares, which are shares of a mutual fund geared toward individual investors. They come with many, as we identified in our complaint and in our briefing, they have additional fees that institutional share classes do not have. Here, several of the plaintiff's funds have these A-shares. Additionally, there were several other shares which were in the wrong share class throughout the class period. Any prudent fiduciary doing their job would have removed these shares at any point during the class period, which the defense did not do. A second violation was that a trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical other than the lower cost of products the trustee has already selected. This, again, has to do with the selection of the higher cost mutual funds instead of the lower cost share classes. The plan here had at least $1.2 billion in assets at all times during the class period and had between 27,000 and 35,000 participants throughout the class period. What this means is that it could have asked for the lowest price funds available and could have received it. It also impacts our other claim in this case that the plan was overpaying for record-keeping fees. The facts below show that the plan had negotiated for a $48 per participant fee. For purposes of our complaint, what we took issue with is that in the marketplace, any plan that has between 27,000 and 35,000 participants can negotiate a record-keeping fee anywhere from $21 to $35. What was so egregious in this case is that the agreement that the plan fiduciaries agreed to made no adjustments for adding additional plan participants to the plan. There was no opportunity for the fiduciaries to lower the record-keeping fees throughout the class period. We estimate the damages here were in the millions of dollars, at least $23 million. Additionally, there were other indications of imprudence that we believe the district court ignored. For instance, there were many funds in the plan that didn't change during the entire class period, which is an indication that the plan fiduciaries were not actively reviewing the funds in the plan. Additionally, there were indications that the plan fiduciaries were not following the bottom portfolio theory because several of the funds lacked true diversification. What we mean by that in the complaint is that there was a lot of overlap of several funds in the same category, which was obviously redundant. There was something else called drift capitalization, where the funds over time drifted from what they were initially supposed to be. The complaint also goes ahead and compares the expenses of the funds in the plan to the expenses of other funds in other plans. We have charts that show the huge discrepancy by various percentage points that the plan here had funds that were grossly more expensive than other funds. We have charts that show the huge discrepancy by various percentage points that the plan here had funds that were grossly more expensive than other funds. Another mistake we believe the district court did here was that it heightened the burden on plaintiffs to come up with different reasons why the funds that were offered were prudent. What I say by that is that the court said that even though we had identified, and I don't believe this is controversial, we had identified that several of the funds in the plan had lower cost alternative shares, the argument from the other side was that there were other benefits for offering a different share class fund. However, as other courts have stated, it is not the plaintiff's burden to show what other reasons you have for offering those funds. We have made a culpable argument, culpable allegations in the beginning that these funds were imprudent. It is through discovery and summary judgment that defendants may question the appropriateness of the, that they defend the appropriateness of the funds. And I point out, for example, in the Eighth Circuit case of Davis versus Washington, where the Eighth Circuit said in reversing a win for the defendants said with respect to Lewis Shur classes that plaintiffs have said one thing and defendants have another explanation. However, we can't resolve that, we can't resolve that conflict at the motion to dismiss stage. Lastly, I want to talk about the Ninth Circuit precedent that we believe merits the reversal of the district court case. In 2016, the court, after several, after a remand to the district court and an appeal back to the Ninth Circuit, the court had to decide, the court took a look at the facts of Tibble versus Edison. And in that case, in 2016, this court stated, a trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical, other than the lower cost to products the trustee has already selected. We submit, Your Honors, that that statement from this court applies directly to a case like this, where we have alleged that there was a billion dollar plan throughout the class period that had every ability to negotiate lower cost share classes of identical funds. The majority of district courts that have interpreted this court's holdings, and not just district courts, but other appellate courts, including the Third Circuit, have also followed suit with what the Ninth Circuit said in 2016, and have denied motions to dismiss claims exactly like the ones we have in this case. I have three hours rest now, Your Honors, and reserve the rest of my time for rebuttal. You may do that. We'll hear next from Ms. Vergara. Good morning, Your Honors, and may it please the court. Catalina Vergara on behalf of Trader Joe's. I'd like to begin where opposing counsel began with Hughes v. Northwestern. This case is not at all inconsistent with the Supreme Court's ruling in Hughes v. Northwestern. Counsel, let me just get to right what concerns me in this case. What seems unusual to me is that many of the investments here had identical counterparts that carried lower fees. We're not dealing, in this instance, with apples and oranges. We're dealing with big apples and little apples. And as I see the question here, we're dealing only with the pleadings and not with what ultimately you may prove or a fact finder may find. But it seems to me that when the investments are identical except that one costs more and therefore reduces the value to the beneficiaries, it's plausible to say that that is a failure of the duty of prudence. Why is that wrong? That's wrong for a number of reasons. First, Your Honor, there's nothing imprudent about selecting a share class that is more expensive than another share class. It's what's been described as the difference between retail and institutional, although there are other variations in share classes. This court in white recognized that there's nothing imprudent with selecting a retail class. There's also nothing imprudent about revenue sharing, and here that is the key. Plaintiffs acknowledge that fiduciaries can and do select higher share classes sometimes to offset the administrative costs of a plan. But here, there's an extra wrinkle there, too, because isn't it a subsidiary that is the recipient of the extra fees in this case? No, Your Honor, and that's actually something that's very important and very important particularly in this case. Here, we have a record-keeping agreement that is referenced in the complaint, incorporated by reference, a document that the district court took judicial notice of. That record-keeping agreement states in black and white that this fund revenue, the additional amounts that are received for the funds that have this revenue sharing, this fund revenue, that fund revenue is used to pay the pre-negotiated administrative expenses that Capital Research receives as the record-keeper, and then the entire remainder, and this is at SER 17, the entire remainder of the fund revenue is returned to the plan. It's returned to the plan, it's kept in a plan account for plan expenses, and eventually returned to plan participants. So here, whereas in other cases there might be sort of a philosophical question about what the revenue sharing was going towards, and whether it was justified given the fees in the case, here we have an arrangement that in black and white states that any delta above and beyond. Is there in fact a delta, though? Yes, Your Honor, we can see that there is a difference between certain share classes. No, that's not my question. Was there money left over that was returned to the plan, in fact? There was, yes, Your Honor, there was. In the proceedings, we have to look at the complaint only for purposes of dismissal. So where in the complaint, other than in theory, is your comment supported? In the reference to the record-keeping agreement, which is incorporated. That is in theory. You have just told us that in fact, under that agreement, money has been returned to the plan. I didn't see that in the complaint. And so if it's not in the complaint, it's only theoretical in the agreement under the thing that we must look at, which is the complaint and its attachments. Well, Your Honor, respectfully, the court need not give credit to allegations in the complaint that are contradicted by the jury. It's not contradicted. It says if I, I'm going to go out and buy lunch. If I have any money left over, I'll give it to a busker on the street. But if I use it all, I don't. You don't know whether I'm going to have any money left over or not. And that's my point about the agreement. It doesn't demonstrate that money will be left over. It says, in theory, if there is any, you'll get it. But it doesn't show that there is any. Well, Your Honor, respectfully, the share classes, and opposing counsel would concede this, the share classes, the fund revenue that is received from these share classes is used to pay administrative expenses. So in the situation that you're describing, I believe what you're describing is a situation where the fund revenue would not be enough to pay the administrative expenses. That's not the situation. No, that isn't what I'm saying at all. I think you're sort of, maybe I'm not communicating very well, but you have, relative to other plans, says the complaint, the costs of administering this plan are extremely high on a percentage basis. I mean, in real life, the difference between $21 and $41 might not make anyone in this room uncomfortable, but when you multiply it by many thousands of people, it's a lot of money. So the complaint says these fees are very high. There's no indication in the complaint that, in fact, any of this money is returned to the plan. That's what I'm trying to get at. And it's the complaint alone that we are reviewing here. You may be right that if this case is tried, you can demonstrate that, well, it says $41, but in fact, $20 really did get returned. We don't know that at this point, and we can't speculate about that. That's my concern. Understood, Your Honor. I think we need to unpack this, because I think in this complaint, as with many others in this space, there's sort of a stacking of suggestions and inferences that, when you look at them precisely, really respectfully amount to nothing. So let's start from the first point of the fees being exorbitantly high, according to plaintiff's counsel. According to the complaint. We don't care what counsel... No offense. According to the complaint. We're not relying on counsel. We're relying on the complaint. Understood, Your Honor. According to the allegations in the complaint, the fees are too high. There's nothing to support that here. What they allege, what they put in their complaint are fees that were allegedly paid by other plans that they allege are comparable in size. That is not enough. That is not enough to state a plausible claim for fiduciary breach. But it goes with the other things, which is you selected these expensive... That's why I'm unpacking it. And it is permissible to, in your words, stack, because that's what makes good inferences. I mean, did a child, you know, steal a cookie from the cookie jar? Maybe a crumb doesn't tell you, but an empty cookie jar and a crumb might tell you that, yes, the likelihood is that that's who got the cookie out of the cookie jar. Of course, Your Honor. In that example, of course, you can see the cookie jar and you can see the crumb. Well, you're working hard to avoid my suggestion, which is that it's permissible. In fact, we're supposed to look at the complaint as a whole. And as a totality, bring together all of the little pieces. That's what makes a case. Yes, Your Honor. Absolutely. Here, when you look at their allegations pertaining to the fees, the administrative fees of the plan, again, all they've done is allege that other plans allegedly paid less. They've not done anything to allege that the services that were received by those other plans were at all comparable. And I would direct the court to the Young decision out of the Second Circuit, where then-Judge Sotomayor described that in order for it to be an actual benchmark of something that plausibly supports an inference of fiduciary breach, you actually have to connect the fees that were received with the services offered. And they've not done that here. All they've done is say that $48 is impermissibly high. And then, stacking on top of that, they say that the share classes that were selected to cover those pre-negotiated fees were too high because, as they allege, the fund revenue that was received was more than the $48 per participant. Well, see, that is why it goes together. Because if they had negotiated a $21 fee, they might have been able to select for the investors, the beneficiaries, the lower price, the lower cost form of the identical investment. So what I would offer there, Your Honor, is that that essentially collapses, even though it is a stacking of inferences, that essentially collapses into just an allegation that the fees in and of themselves were too high. Well, it's hard to know which is the chicken and which is the egg, but they certainly go together. Well, but if the fees are not too high, then selecting a method for paying for those fees, revenue sharing through selecting certain share classes, which courts have acknowledged there's nothing per se imprudent about that. If the fees themselves are reasonable, then selecting the share classes is not unreasonable to pay for those fees. And so, again, it collapses into the question of whether the fees were unreasonable. And here, plaintiffs have offered nothing beyond really their say-so, the allegations and the complaint that the number 48 here was too high when other plans were paying a different amount. But they've said nothing about the services that were offered. And I think it's important to note, you know, if you look at the record-keeping agreement that's in our supplemental excerpts of record, at Exhibit A, I think it's on SCR 24, Exhibit A details the services that were received for record-keeping. Record-keeping is not a one-size-fits-all proposition. Different plan sponsors can and do reasonably select different levels of fees, so it says nothing to just say that a different plan paid a different amount if you're not also saying what that plan received for the amount that they paid. Well, that puts a pretty big burden on the plaintiff to allege negatives. The district court said that plaintiffs have alleged that the institutional share classes were less expensive than the other shares and classes in the plan, but they do not allege whether the investor class shares offered other benefits that may have offset any additional costs. And so your position is that they should have, that's an example, but that they should have alleged what? That this plan had this benefit? Well, with respect to the record-keeping fees themselves, Your Honor, I don't actually believe that it puts a huge benefit, excuse me, a huge burden on plaintiffs to allege. And I would direct the court to a decision that came out just in the last couple of weeks. It's Cunningham v. USI Insurance Services. Have you submitted that in a 28-day letter? Would you please do that? Yes, we absolutely will, Your Honor. It's a case out of the Southern District of New York. And the court there explained that the pleading standard doesn't require plaintiffs to plead only retirement savings plans that have wholly identical services. In other words, you don't have to precisely detail the services that your plan received and what the comparator plans received. But there are sources, including publicly available sources, the Form 5500s that are filed publicly that indicate the services that were received. And so there the court held that in order to state a plausible claim of fiduciary breach, you not only have to allege the amount that was received by the other plans, but the basket of services generally received by the other plan and compared to your own. So I don't believe that it puts too much of a burden on plaintiffs. And to be clear, our position here is, you know, as the Supreme Court recognized in Hughes, there's a reasonable range of fiduciary decision-making options. There's a reasonable range of options that can result from the discretionary function that fiduciaries serve. And within that range of reasonable, it's not enough for plaintiffs to come to court and simply point to another reasonable alternative, another reasonable fee, another reasonable investment option, another reasonable share class. They have to do more than that. And this flows from the Supreme Court's jurisprudence in Dudenhofer, in the Amgen case. They have to allege that no reasonably prudent fiduciary with the same information available to this plan, no reasonable fiduciary would have made the choice that these fiduciaries made. And they cannot and they have not alleged that here. That is not enough. And it doesn't put a burden on plaintiffs, respectfully. It simply holds them to the Twombly and Iqbal pleading standard, which, again, the court in Hughes v. Northwestern emphasized does apply to these cases. The other thing that I would note, Your Honors, from Hughes v. Northwestern is that the court recognized that these cases require a context-specific approach. Because what is required of planned fiduciaries depends on the information that was available to them at the time. And here, plaintiffs have failed under that context-specific approach to allege anything that is actually grounded in the facts of this case to support a plausible inference of the breach of the duty of prudence or a breach of the duty of loyalty or a failure to monitor. And I really would urge, Your Honors, to look at the record-keeping agreement that is incorporated into the complaint and that the court took judicial notice of. Because here, whereas plaintiffs allege that the math doesn't add up, that the share classes resulted in fees and fund revenue coming back to the plan that was greater than the pre-negotiated administrative expenses, that math does not need to be—that's not a fact issue that requires discovery because the record-keeping agreement states very plainly in black and white that all of the additional fund revenue would come back to the plan for the benefit of planned participants. And under those facts, plaintiffs have failed to allege any claim of fiduciary breach. Unless the court has any other questions, I see that my time is up. Thank you. Thank you, Your Honors. Mr. Jando has some rebuttal time remaining. Thank you, Your Honor. Just to address the record-keeping argument, in our complaint, we allege that if the $40 per participant was supplied, as the defendants say, it would have amounted to $30 million in fees of the class period. I'm sorry. It would have amounted to $7.5 million through the class period. But if you look at the delta between the lowest-shared class and the highest-shared class, you have something like $30 million worth of excess fees, which means if what the defendants are saying is true, which we do not know, that $23 million was returned to the plan during the class period. Well, that raises so many questions that it's not even possible to resolve the motion to dismiss. Why do you have a $23 million delta? If you have a contract with the record-keeper, the amount you pay should be similar to what you collect. Then it becomes a question of whether the fiduciaries actually did the right thing in how they collected their revenue sharing. Excuse me. I have a question. Do you have some sort of an expert in your wings out there that's going to make all these calculations and go back to all these documents about when they were invested at what time and what place and then compare them with what you have now? Do you have something like that? Yeah, so what typically happens, Your Honor, is once we're allowed to go to discovery, we'll need more information from the defendants, such as the disclosures and the actual – and then receipts from the record-keeper to see how much money they actually received. And then we can make the – and then we'll be able to make the calculations as to what was received. But we must also not forget we're not – we think the $48 was excessive, and it's not just because other plans paid less. We're prepared to show that through expert testimony that the $48 was excessive. And that goes beyond the complaint, though, right? Yeah, it goes beyond the complaint, and I don't think that's needed. But just to counter what my opposing counsel said, it's not just a bare allegation. We have several nuggets of allegations that lead to circumstantial evidence that there is imprudence here. I have a question related to Judge McNamee's question, and that has to do with – I didn't entirely understand the compensation recapture account that's dealt with in paragraph 124. Is that related to what you're discussing now, or is that a different item? It is related, Your Honor, because typically what would happen is that if the fiduciaries overcharge the plan participants, they will put the money into a recapture account. And that is the money that doesn't go back to the plan participants, but the defendants or the plan sponsor will use it for anything that deemed to be administrative costs. And so your chart shows that the balance grew slightly each year. Yes. We don't even know where the money went. We're assuming it went in the recapture account, but we don't have enough information. But we do know it wasn't in the participants' pockets, and the whole point of our complaint is that – How do you know that? It didn't go into their pocket, and the fund, it goes back to the participants. How do you know that now when you say you're lacking in information about so many other things that you'll need discovery to find out that information? How do you know that? Because you put that in your complaint. How do you know that? Well, we know it – well, first of all, we have some access to it. Paragraph 124 shows the amount that went back to the participants. That's how you know how much is left at the end of the year. Right. But I mean, how does he know that he said – in my mind, I could be wrong that you said you didn't know where the money went to, and you're speculating. So help me out here. Well, the reason we don't know is because we don't have access to the recapture account. We actually don't know what's in there. You know how much was distributed and how much wasn't. It's the wasn't, you don't know where it went. Yes. Okay. That's information we lack. I believe your time has expired. Oh. Thank you very much. Okay. Thank you. Thank you. We appreciate the arguments from both counsel in this challenging case. The case just argued is submitted.
judges: SCHROEDER, GRABER, McNamee